**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

MENCHIES GROUP, INC.,

          Plaintiff,

   vs.

MASSACHUSETTS BAY INSURANCE
COMPANY and HOUSTON CASUALTY
COMPANY,

       Defendants.

Case No. 1: 22-cv-04237-MKV

**AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff, Menchies Group, Inc. ("Menchies"), files this Amended Complaint for Declaratory Judgment and Breach of Contract against Defendants, Massachusetts Bay Insurance Company d/b/a The Hanover Insurance Company ("MB") and Houston Casualty Company ("HCC") (collectively, "Defendants"), alleging as follows:

## NATURE OF ACTION

1.      This is an action for declaratory judgment and breach of contract arising out of the refusal of Defendants, multi-billion dollar businesses, to live up to their promise to their policyholder, Menchies. Defendants promised to pay for, in exchange for premiums paid, physical loss of or damage to and related business interruption losses and expenses at the covered locations under an "all risk" insurance policies.

2.      Menchies is a corporation that owns and operates frozen yogurt shops throughout several States, including California, Georgia, Arizona, New Jersey, Ohio, Washington, Florida, Texas, and Kentucky.

3.      This all changed in 2020 with the COVID-19 pandemic. The pandemic had an unprecedented and catastrophic effect on Menchies' properties and business operations, causing millions of dollars in losses.

4.     The havoc wrought by the pandemic is well-documented. According to the Centers for Disease Control ("CDC"), as of February 28, 2022, COVID-19 has infected more than seventy-eight million people and killed nearly 945,000 in the United States. The states where Menchies' properties are located have not been spared from this tragedy.

5.     Beyond the human toll, the pandemic has had a devastating impact on the economy of the states where Menchies' properties are located, causing widespread physical losses, property damage and loss for many businesses, including Menchies'.  As a result of the pandemic, Menchies has been prevented from conducting normal business operations and deprived of the use of its business properties. Even when permitted to open, as a result of the spread of COVID-19, Menchies' properties required substantial physical alterations and other protective measures. Further, the presence of COVID-19 and SARS-CoV-2 within Menchies' insured properties also caused direct physical loss of or damage to property (or both) by transforming the property from usable and safe into property that are unsatisfactory and prohibited for use, uninhabitable, unfit for their intended function, and extremely dangerous and potentially deadly for humans.

6.     SARS-CoV-2 and COVID-19 caused direct physical loss of or damage to properties (or both) throughout the locales where Menchies' properties are based, including to Menchies' covered properties and surrounding properties, by altering the physical conditions of the properties so that they were no longer safe or fit for occupancy or use, and/or permitted to be used. Specifically, SARS-CoV-2 attaches itself to surfaces and properties, thereby producing physical change in the condition of the surfaces and properties—from safe and touchable to unsafe and deadly. SARS-CoV-2 and COVID-19 also physically alter and damage the air within buildings such that the air is no longer safe to breathe.

7.     It is often the case that the source of a covered property insurance loss can ultimately be cleaned, removed, contained, or remediated, yet that does not mean that there was no "loss of or damage to" property in the first place. This was true for mold, odors, smoke, fumes, and asbestos fibers that triggered coverage in other cases and the same is true here. That is especially significant when it comes to business interruption losses, where even modest impacts to property lead to covered losses. The coronavirus can be disinfected or cleaned, but it still causes a distinct and demonstrable alteration to property. That is what has triggered coverage for Menchies' significant losses here.

8.     Because of the physical alterations of its properties, including the air, airspaces, and surfaces in its properties, which rendered the insured properties incapable of performing their essential functions, Menchies sustained direct physical loss of or damage to its property (or both). The disruption of normal business operations resulted in the severe and substantial losses more particularly described below.

9.     As a direct cause from the COVID-19 pandemic and/or the closure orders, together with Defendants' failure to live up to its obligations under the "all risk" policy, Menchies was forced to file this action. Menchies would not have had to file and incur the cost of this legal proceeding if Defendants had paid the loss and damage it was obligated to pay.

10.     To date, Menchies has suffered millions of dollars in loss and damage, all of which remains unreimbursed by Defendants despite being covered under the terms of the policies purchased.

11.     Menchies is yet another victim of the insurance industry's universal denial and rejection of its coverage obligations for COVID-19 business interruption losses. Defendants have left Menchies with no choice but to seek judicial intervention to enforce the obligations owed to it

by Defendants pursuant to the terms and conditions of the "All Risk" and "Restaurant Recovery" insurance policies (the "All Risk Policy" and the "Restaurant Recovery Policy" respectively, or "Policies"). The Policies are attached hereto as **Exhibit A** and **Exhibit B**, and are incorporated herein by reference.

12.     Prior to the pandemic, Menchies purchased an "All Risk" insurance policy and a "Restaurant Recovery" insurance policy from Defendants. These Policies included coverage for direct physical loss of or damage to properties (or both) for business interruption exactly like that caused by the COVID-19 pandemic and/or closure orders, including coverages for accidental contamination, "food contamination" and business interruptions.

13.     The Policies specifically insure against accidental contamination, food contamination and business interruption losses, losses occasioned by government orders, extra expense payments to continue business as nearly normal as practicable, among many other covered losses. Menchies has experienced losses that fall within all of these coverages. For this coverage, including broad "all risk" business interruption protection, Menchies paid significant premium.

14.     Menchies' purchase of these broad coverages created a reasonable expectation that the coverage will apply if Menchies has a business interruption resulting from unforeseen and fortuitous events, such as the physical damage to and inability to use its properties or a forced government shutdown of its businesses as a result of a pandemic or other large-scale natural disaster, as well as food contamination. In particular, Menchies could not foresee the physical damage produced by the COVID-19 pandemic or the government orders shuttering its properties as a result of the physical damage produced by the COVID-19 pandemic. After faithfully paying a high premium for "all risk" coverage, business owner-insured Menchies, who was forced to close its properties from these unprecedented events, had a reasonable expectation that its "all risk"

business interruption insurance and restaurant recovery insurance would apply and protect it. Menchies had such expectations and sought coverage from Defendants for the losses.

15.    Despite the coverage provided and the expectations of Menchies, who paid a significant premium for it, Defendants preemptively denied claims. In violation of state law, Defendants denied coverage without conducting an investigation or considering supporting evidence. Through their conduct, Defendants wrongfully breached obligations under the policies and left Menchies without the insurance benefits it paid for, relied upon, and desperately needed during the business closures and interruptions and to remediate its ongoing property damage.

16.    The insurance industry has repeatedly and falsely warned courts and the media that COVID-19-related claims will bankrupt insurers and force them to raise premiums and restrict coverages — but they have reaped enormous profits by denying covered claims and have continued to raise premiums despite refusing to uphold their coverage obligations.

17.    Menchies seeks a declaration that the presence, statistically certain presence, or suspected presence of the SARS-CoV-2 virions in or on Menchies' properties and the ubiquitous presence of the virions throughout the locales and states where Menchies' covered properties is located, causes direct physical loss or damage to properties within the meaning of those phrases as used in the All Risk Policy sufficient to trigger coverage, including under the coverages for Business Interruption, Extra Expense, and various Additional Coverages and Coverage Extensions.

18.    Menchies also seeks a declaration that various orders issued by governmental officials on account of the presence of persons infected with and/or suffering from COVID-19 and the presence of SARS-CoV-2 in places of business and gathering prevented Menchies from accessing and using its insured properties to conduct its ordinary business activities and deprived

Menchies of its properties and the functionality of its properties, thereby constituting "physical loss or damage" to property within the meaning of that phrase as used in the All Risk Policy sufficient to trigger coverage in favor of Menchies, including under the coverages for Business Interruption, Extra Expense, and various Additional Coverages and Coverage Extensions.

19.    Menchies seeks a further declaration that the terms of the Policies obligate Defendants to pay for accidental contamination, food contamination, and related business interruptions as the premises described in the Policies, and all Business Interruption loss, and Extra Expense incurred, including those expenses that would not have been incurred if there had not been "accidental contamination," "food contamination," "risk of physical loss or damage" or "physical loss or damage" to covered properties, including expenses to temporarily continue as close to normal the conduct of the insured premises, and all incurred and to be incurred losses falling within the scope of Additional Coverages and Coverage Extensions.

20.    Menchies also seeks monetary damages for Defendants' breach of their obligations under the Policies in an amount to be determined at trial, but no less than $4,000,000, and to pay Menchies losses in full including, without limitation, loss mitigation expenses.

## **PARTIES**

21.    Menchies is a California corporation with its principal place of business in Woodland Hills, California.

22.    Upon information and belief, Defendant Houston Casualty Company is a Texas corporation with its principal place of business in Houston, Texas.

23.    Upon information and belief, Defendant Massachusetts Bay Insurance Company d/b/a The Hanover Insurance Company is a Massachusetts corporation with its principal place of business in Worcester, MA.

24.     Defendants, and at all relevant times herein, have been engaged in the business of selling property insurance policies, other insurance policies and other products and services to, among others, companies like Menchies.

## JURISDICTION AND VENUE

25.     This Court has jurisdiction over this matter under 28 U.S.C. § 1332 as there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.

26.     Venue in this Court is proper because the parties have mutually and/or contractually agreed to have this matter heard before this Court.

## FACTUAL BACKGROUND

### I.    MENCHIES' BUSINESSES

27.     Menchies is a corporation that operates numerous yogurt shops throughout the country, serving many dine-in customers. The insured properties were the locations of centers of interaction throughout the country, whose use were impacted by the COVID-19 outbreak and contamination. Multiple customers and employees at and in contact with the insured premises tested positive for COVID-19, creating a dangerous condition on the properties with actual contamination and extra expenses related to attempts to mitigate the danger.

28.     Menchies' insured properties are described in the Policies or identified in Location Schedules attached to the Policies.

### II.   THE COVID-19 GLOBAL PANDEMIC

29.     In December 2019, during the term of the Policies, an outbreak of illness known as COVID-19 caused by a novel coronavirus formally known as SARS-CoV-2 was first identified in Wuhan, Hubei Province, China. In an unprecedented event that has not occurred in more than a

century, a pandemic of global proportions then ensued, with the illness and virus quickly spreading to Europe and then to the United States.

30.     In 2020, COVID-19 decimated the economies of the states and federal district where Menchies properties are located, including Menchies business operations.

31.     COVID-19 is highly transmissible and spreads rapidly. For example, as of March 1, 2020 there were 87,137 confirmed COVID-19 cases across the globe.[1] That number increased to over 800,000 confirmed cases in April and over 3,000,000 cases in May.[2] According to the CDC, to date, COVID-19 has infected more than seventy-eight million people and killed nearly 945,000 in the United States.

32.     At the pandemic's peak, over 4,000 Americans were perishing per day from COVID-19.[3] A substantial number of Americans are still dying daily, with surges of cases and new and ever more contagious variants of the Coronavirus occurring throughout the U.S.[4] COVID-19 is now the third-leading cause of death in this country, surpassed only by heart disease and cancer.[5]

33.     COVID-19 can be transmitted in several ways, including via human-to-human contact, airborne viral particles, particularly within enclosed properties like the insured locations, and touching surfaces or objects that have SARS-CoV-2 virions on them.

---

[1] *See* https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200301-sitrep-41-covid-19.pdf.

[2] *See* https://graphics.reuters.com/CHINA-HEALTH-MAP/0100B59S39E/index.html.

[3] Eugene Garcia, Lisa Marie Pane and Thalia Beaty, *U.S. tops 4,000 daily deaths from coronavirus for 1st time,* AP NEWS, Jan. 8, 2021, https://apnews.com/article/us-coronavirus-death-4000-daily-16c1f136921c7e98ec83289942322ee4 (last visited May 25, 2021).

[4] https://covid.cdc.gov/covid-data-tracker/#trends_dailytrendsdeaths (last visited May 25, 2021); Johns Hopkins Medicine, *Coronavirus Second Wave? Why Cases Increase,* updated Nov. 17, 2020, https://www.hopkinsmedicine.org/health/conditions-and-diseases/coronavirus/first-and-second-waves-of-coronavirus (last visited May 25, 2021).

[5] Gary Stix & Youyou Zhou, *COVID-19 Is Now the Third Leading Cause of Death in the U.S., S*CI. AM. (Oct. 8, 2020), https://www.scientificamerican.com/article/covid-19-is-now-the-third-leading-cause-of-death-in-the-u-s1/ (last visited June 3, 2021).

34.    COVID-19 spreads easily from person to person and person to surface or object. Research has revealed that COVID-19 primarily is spread by small, physical droplets expelled from the nose or mouth when an infected person talks, yells, sings, coughs, or sneezes. A person who sneezes can release a cloud of SARS-CoV-2-containing droplets that can span as far as 23 to 27 feet. The CDC has stated that SARS-CoV-2 is most likely to spread when people are within six feet of each other, but has also recognized that SARS-CoV-2 may spread from an infected person who is more than six feet away or who has left a given space. Further, according to the CDC, longer exposure time likely increases exposure risk to COVID-19.

35.    Infected people shed copious amounts of SARS-CoV-2 into the air and surfaces around them by several different mechanisms, as illustrated in the below figure.[6] SARS-CoV-2 damages the air and surfaces of a property.

---

[6] Menchies already has engaged a virologist expert, Dr. Angela Rasmussen, Ph.D., who at the appropriate phase of this litigation will substantiate and elaborate on SARS-CoV-2 and the physical damage it causes to property. Dr. Rasmussen is an affiliate of the Georgetown Center for Global Health Science and Security and a research scientist III (Associate Professor equivalent) at the Vaccine and Infectious Disease Organization-International Vaccine Centre (VIDO-InterVac), as well as an adjunct professor in the department of biochemistry, microbiology, and immunology at the University of Saskatchewan.



36.     SARS-CoV-2 is exhaled in respiratory particles through normal breathing, as well as coughing, speaking, singing, shouting, or exerted breathing, into the air by persons with COVID-19, including symptomatic and asymptomatic persons, where it persists in respiratory aerosols and droplets. Aerosols can remain suspended in the air for prolonged periods of time, where they can travel distances greater than 6 feet and eventually settle on surfaces to become fomites (infectious objects). Infectious aerosols can accumulate in enclosed spaces and present a significant infection risk in a manner that is dependent on concentration, not distance. Notably, without adequate ventilation and air filtration, the transformation of indoor air by people in an

enclosed space for a long period of time presents a substantial infection hazard that cannot be mitigated solely with masks and distancing, resulting in damage to the property.

37.    In addition to damage to the property via transformation of the indoor air, SARS-CoV-2 can be deposited on surfaces either through direct contact with respiratory secretions or saliva of an infected person (transfer by hand or tissue) or by settling of particles from the air.

38.    This depositing of dangerous particles on surfaces and food products distributed and sold by Menchies resulted in extensive "accidental contamination" and "food contamination" losses as more specifically described in the Policies.

39.    Inhalation of infectious aerosols is a major mode of SARS-CoV-2 transmission, providing a clear mechanism for SARS-CoV-2 in the air to damage property. Although fomite transmission is thought to be uncommon, it is still a viable mode of transmission along with the more dominant modes of transmission by direct contact and inhalation of infectious SARS-CoV-2, and risk of fomite transmission is dependent on prevalence in the community, virus shedding, environmental features such as heat or humidity, mitigation efforts such as masks, distancing, or ventilation, rate of deposition of virus particles onto surfaces, frequency of exposure to those surfaces, and achieving minimum infectious dose.

40.    All three modes of transmission have been demonstrated in multiple experimental models. Exhaled respiratory particles and fecal bioaerosols present a significant transmission risk even after they have settled and are no longer suspended in the air, and disturbances can resuspend them in the air.

41.    Thus, SARS-CoV-2 causes property damage by rendering property unsafe and unfit for habitation and use, by transforming both the shared air breathed by the property's occupants and the physical surfaces of the property itself.

42.     The presence of infected people on the property ensure that infectious SARS-CoV-2 will inevitably be shed into the air and onto surfaces, damaging the property by rendering it unsafe for occupation and use without extreme mitigation measures.

43.     Making matters worse, pre-symptomatic and asymptomatic individuals can also transmit COVID-19.[7] Over 40% of all infections occur from people without any symptoms.[8] Thus, even individuals who appear healthy and present no identifiable symptoms of the disease have and continue to spread the virus by breathing, speaking, or touching objects and surfaces. These activities deposit SARS-CoV-2 virions in the air and on surfaces rendering the air and surfaces changed from their previous condition. According to the World Health Organization (the "WHO"), the incubation period for COVID-19, i.e., the time between exposure to SARS-CoV-2 and symptom onset, can be up to 14 days. Other studies suggest that the period may be up to 21 days.

44.     Before infected individuals exhibit symptoms, *i.e.,* the so-called "pre-symptomatic" period, they are most contagious, as their viral loads will likely be very high, and they may not know they have become carriers. In addition, studies from the CDC and others estimate that between 40% to 70% of infected individuals may never become symptomatic (referred to as "asymptomatic" carriers). Pre-symptomatic and asymptomatic carriers are likely unaware that they are spreading SARS-CoV-2 by merely touching objects and surfaces, or by expelling droplets into the air. The National Academy of Sciences has found that the majority of transmission is attributable to people who are not showing symptoms, either because they are pre-symptomatic or asymptomatic.

---

[7] *See* https://www.nature.com/articles/s41591-020-0869-5.
[8] *See id.;* https://www.nbcnews.com/health/healthnews/asymptomatic-covid-19-cases-may-be-more-common-suspected-n 1215481.

45.    Although these virus-containing droplets are very small, they are still physical, tangible objects that can travel and attach to other surfaces, "such as tables, doorknobs, and handrails," and cause harm, loss, and damage, and physically alter the property and/or the integrity of the property. Viruses, themselves, are microscopic and made up of genetic material surrounded by a protein shell[9], but they are capable of being observed and can attach themselves to other things they encounter. When droplets and viruses contact objects, they alter those objects, although not in way perceptible by the naked human eye. These virus-containing droplets physically exist ubiquitously in the communities and buildings in which Menchies operates.

46.    According to the CDC and the WHO, a person may become infected by touching these surfaces or objects that have SARS-CoV-2 on them, and then touching his or her mouth, eyes, or nose. And, when an uninfected person touches a surface containing SARS-CoV-2, the uninfected person may transmit COVID-19 to another person, by touching and infecting a second surface, which is subsequently touched by that other person. The CDC has thus recommended certain physical and structural remedial measures for businesses to put into place in order to limit transmission and continued surface alteration.

47.    Numerous scientific studies have reported that SARS-CoV-2 can survive and persist within the air and on surfaces and buildings after infected persons are present at a given location. Studies have found that SARS-CoV-2 remains active and dangerous in the air in properties and on common surfaces, including plastic, stainless steel, glass, wood, cloth, ceramics, rubber, and even money.[10] All of these materials are widely present at Menchies' insured locations

---

[9] *See* https://rockedu.rockefeller.edu/component/what-are-viruses-made-of/

[10] *See, e.g.,* https://www.thelancet.com/journals/lanmic/article/PIIS2666-5247(20)30003-3/fulltext; https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4659470/; *See* https://www.nih.gov/news-events/nih-research-matters/study-suggests-new-coronavirus-may-remain-surfaces-days; https://www.cdc.gov/coronavirus/2019-ncov/more/scientific-brief-sars-cov-2.html.

and subject to touch by the multitudes of people visiting and working at Menchies' insured locations daily.

48.     Generally being enclosed spaces where large numbers of people gather in close proximity for social and business purposes, highly trafficked properties like Menchies' properties, are reportedly particularly susceptible to circumstances favorable to the spread of SARS-CoV-2 virions. An article published in April 2020 analyzed a case study of three families (families A, B, and C) who had eaten at an air-conditioned restaurant in Guangzhou, China.[11] One member of family A, patient Al, had recently traveled from Wuhan, China. On January 24, 2020, that family member ate at a restaurant with families A, B, and C. By February 5, 2020, 4 members of family A, 3 members of family B, and 2 members of family C had become ill with COVID-19. The only known source for those affected persons in families B and C was patient Al at the restaurant. Moreover, a study detected SARS-CoV-2 inside the heating and ventilation ("HVAC") system connected to hospital rooms of sick patients. The study found SARS-CoV-2 in ceiling vent openings, vent exhaust filters, and ducts located as much as 56 meters (over 183 feet) from the rooms of the sick patients.[12]

49.     Additionally, the CDC has stated that "there is evidence that under certain conditions, people with COVID-19 seem to have infected others who were more than 6 feet away"and infected people who entered the space shortly after the person with COVID-19 had left.[13] A published systematic review of airborne transmission of SARS-CoV-2 corroborated the CDC's concerns and recommended procedures to improve ventilation of indoor air environments

---

[11] *See* https://wwwnc.cdc.gov/eid/article/26/7/20-0764 article.
[12] Karolina Nissen, et al., *Long-distance airborne dispersal of SARS-CoV-2 in COVID-19 wards,* 10 NATURE SCI. REPORTS 19589 (Nov. 11, 2020), https://doi.org/10.1038/s41598-020-76442-2 (last visited May 25, 2021).
[13] CDC, *How COVID-19 Spreads* (last updated Oct. 28, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last visited May 25, 2021).

to decrease bioaerosol concentration and physically reduce potential spread of SARS-CoV-2 in properties like the insured location.[14]

50.     The CDC has recommended "ventilation interventions" to help reduce exposure to the airborne Coronavirus in indoor spaces, including increasing airflow and air filtration (such as with high-efficiency particulate air ("HEPA") fan/filtration systems).[15] These and other remedial measures must be implemented, at high cost and extra expense, to reduce the amount of the SARS-CoV-2 present in a given space and to make property safe for its intended use. These remedial measures demonstrate direct physical loss of or damage to interior spaces like the insured locations even where no virus is present.

51.     The extent and nature of presymptomatic viral shedding suggests that property damage through environmental exposure and persistence in the air, surfaces, and floors is inevitable for high-traffic venues such as restaurants, hospitals, casinos, cruise line vessels, and event spaces, environments that are highly conducive to SARS-CoV-2 spread. This leads to additive, sustained property damage, as those who are infected then shed virus themselves, further damaging the property and rendering it unsafe and unfit for use.

52.     A single introduction of SARS-CoV-2 can persist in indoor environments for long periods of time. SARS-CoV-2 RNA has been detected on packages even after international transport, as well as on numerous environmental samples in locations where infected people have visited or shopped, such as markets, airplanes, ships, or event venues.

---

[14] Zahra Noorimotlagh, et al., *A systematic review of possible airborne transmission of the COVID-19 virus (SARS-CoV-2) in the indoor air environment,* 193 ENV'T RSCH. 110612, 1-6 (Feb. 2021), https://www.sciencedirect.com/science/article/pii/S0013935120315097?dgcid=rsssd_ all (last visited May 25, 2021).
[15] CDC, *Ventilation in Buildings* (last updated Feb. 9, 2020), https://www. cdc. gov/coronavirus/2019-ncov/community/ventilation.html#:~:text=HEPA%20filters%20are%20even%20more,with%20S ARS%2DCoV%2D2 (last visited May 25, 2021).

53.     The proposition advanced by the insurance industry that an indoor space containing the infectious SARS-CoV-2 virions can be made safe and fit for its functional and intended use even though the virions remain in the air and circulating throughout indoor environments either affixed to property or in an aerosol capacity because the virions can be removed by routine surface cleaning, is false.

54.     A number of studies have also demonstrated that SARS-CoV-2 is "much more resilient to cleaning than other respiratory viruses so tested."[16] The measures that must be taken to remove the Coronavirus from property are significant and far beyond ordinary or routine cleaning.

55.     Efficacy of disinfecting agents for viruses is based on a number of factors, including the initial amount of virus present, contact time with the disinfecting agent, dilution, temperature, and pH, among many others. Detergent surfactants are not recommended as single agents, but rather in conjunction with complex disinfectant solutions.[17]

56.     Additionally, it can be challenging to accurately determine the efficacy of disinfecting agents. The toxicity of an agent may inhibit the growth of cells used to determine the presence of virus, making it difficult to determine if lower levels of infectious virus are actually still present on treated surfaces.[18]

---

[16] *Id*
[17] *Id.*
[18] *Id*

57.    In order to be effective, cleaning and decontamination procedures require strict adherence to protocols not necessarily tested under "real life" or practical conditions, where treated surfaces or objects may not undergo even exposure or adequate contact time.[19] Studies of coronaviruses have demonstrated viral RNA persistence on objects despite cleaning with 70% alcohol.[20]

58.    When considering decontamination, the safety of products and procedures must be considered as well, due to the risks of harmful chemical accumulation, breakdown of treated materials, flammability, and potential for allergen exposure.[21]

59.    Moreover, the aerosolized SARS-CoV-2 particles and virions cannot be eliminated by routine cleaning. Cleaning surfaces in an indoor space will not remove the aerosolized SARS-CoV-2 particles and virions from the air that people can inhale and develop COVID-19 — no more than cleaning friable asbestos particles that have landed on a surface will remove the friable asbestos particles suspended in the air that people can inhale.

60.    Moreover, given the ubiquity and pervasiveness of SARS-CoV-2, no amount of cleaning or ventilation intervention will prevent a person infected and contagious with the virus from entering an indoor space like the insured properties and exhaling millions of additional particles and virions into the air, further: (a) filling the air with the aerosolized SARS-CoV-2 virions that can be inhaled, sometimes with deadly consequences; and (b) depositing SARS-CoV-2 particles and virions on surfaces, physically altering and transforming those surfaces into disease-transmitting fomites.

---

[19] *Id*

[20] Joon Young Song, et al., *Viral Shedding* and *Environmental Cleaning in Middle East Respiratory Syndrome Coronavirus Infection,* 47 INFECTION & CHEMOTHERAPY 4, 252-5 (2015), https://www.icjournal.org/DOIx.php?id=10.3947/ic.2015.47.4.252 (last visited May 25, 2021).

[21] *Id*

61.     Even as vaccines to protect against COVID-19 have recently become more available, distribution remains uneven in the United States. Effective control of the disease's spread since the pandemic began has necessarily relied on measures designed to reduce human-to-human and surface-to-human exposure. Similarly, the governmental orders closing or severely limiting use of non-essential business premises like Menchies business premises are one of the most common modes of preventing transmission of the disease because, among other things, the orders reduce the size and frequency of social gatherings and the physical use of properties.

## III.   COVID-19 AND SARS-COV-2 CAUSE DIRECT PHYSICAL LOSS AND DAMAGE

62.     Virologists, scientists, and researchers all have confirmed that SARS-CoV-2 remains viable and is active on physical surfaces and in the air. The persistent presence of the deadly, viable SARS-CoV-2 on surfaces and in the air damages buildings and properties rendering them damaged, lost, unsafe, unfit, and uninhabitable for normal occupancy or use.

63.     Specifically, the scientific community has confirmed that SARS-CoV-2 and COVID-19 alter the conditions of properties and buildings such that the premises are physically damaged and no longer safe and habitable for normal use. In this regard, SARS-CoV-2 and COVID-19 cause direct physical loss of or damage to buildings and properties (or both).

64.     This direct physical loss of or damage to property (or both) results because SARS-CoV-2 has a corporeal existence and is contained in respiratory droplets. Once expelled from infected individuals, these droplets land on, attach, and adhere to surfaces and objects and physically changes these once safe surfaces to "fomites." Fomites are objects, previously safe to touch, that now serve as a vehicle and mechanism for transmissions of an infectious agent. Fomites are the result of SARS-CoV-2 physically changing air and property, making it unsafe. This physical alteration and change makes physical contact with those previously safe indoor spaces and inert surfaces *(e.g.,* walls, handrails, desks) unsafe and potentially deadly. This represents a

physical change in the affected enclosed space, surface or object, causing severe property loss and damage. Affected properties are unusable, dangerous, and unsafe until the COVID-19-related conditions are fully rectified.

65.     Medical and scientific research also has established that SARS-CoV-2 and COVID-19 spread through indoor airborne transmission. When individuals carrying SARS-CoV-2 breathe, talk, cough, or sneeze, they expel aerosolized droplet nuclei that remain in the air, accumulate in buildings, and, like dangerous fumes, make the premises unsafe and affirmatively dangerous. According to experts, buildings and properties accumulate the airborne SARS-CoV-2 indoors, which plays a significant role in community transmission. As a result, SARS-CoV-2 and COVID-19 cause direct physical loss of or damage to properties and buildings (or both) by changing the physical condition of air in buildings from safe and breathable to unsafe and dangerous.

66.     Further, airborne viral particles are known to be able to spread into a facility's HVAC system, leading to transmission of SARS-CoV-2 from person to person. The Environmental Protection Agency ("EPA") has recommended that facilities make improvements to their ventilation and HVAC systems by, for example, increasing ventilation with air filtration and outdoor air. Accordingly, COVID-19 and SARS-CoV-2 cause direct physical loss of or damage to property (or both) by, among other things, destroying, distorting, corrupting, attaching to, and physically altering property, including its surfaces, and by rendering property unusable, uninhabitable, unfit for intended functions, dangerous, and unsafe.

67.     Fomites, droplets, droplet nuclei, and aerosols containing SARS-CoV-2 are not theoretical, informational, or incorporeal, but rather are dangerous physical objects that have a tangible existence. Their presence within an insured property causes direct physical loss of or damage to property (or both) by necessitating remedial measures that include without limitation

repairing or replacing air filtration systems, remodeling and reconfiguring physical spaces, removal of fomites by certified technicians, and other measures. The presence of COVID-19 and SARS-CoV-2 within an insured property also causes direct physical loss of or damage to properties (or both) by transforming property from usable and safe into a property that is unsatisfactory for use, uninhabitable, unfit for its intended function, and extremely dangerous and potentially deadly for humans.

68.    The presence of SARS-CoV-2 on property similarly creates the imminent threat of further damage to that property or to nearby property. Individuals who come into contact, for example, with respiratory droplets at one location in the property by touching a doorknob, table, or handrail, will carry those droplets on their hands and deposit them elsewhere in the property, causing additional damage and loss. Property impacted by SARS-CoV-2 is just as dangerous as property impacted by fire or fumes or vapors (if not more), and all such damaged property is equally incapable of producing revenues. Like the impact of fire, smoke, or noxious fumes, the impact of potentially fatal COVID-19 constitutes direct physical loss of or damage to property (or both).

69.    The direct physical loss of or damage to property (or both) described in this section has occurred at Menchies s insured locations, leading to losses covered by the Policies. Menchies had to take action to secure and preserve its properties and its business operations. This physical loss of or damage to property includes damage caused by food contamination and accidental contamination relating to the ubiquity of the virus.

70.    To the extent that the Policies require structural alteration to establish "physical damage," which Menchies disputes, such alteration has occurred and rendered the insured properties incapable of performing their essential functions. Menchies' losses are ongoing and are

likely to increase substantially given the length and ultimate severity of the outbreak and the government response. Moreover, to the extent that the All Risk Policies require a permanent loss of property to establish "physical loss," which Menchies disputes, such permanent loss has occurred.

## IV.    REACTIONS AT THE NATIONAL, STATE, AND LOCAL LEVELS

71.    Federal and state governments tried to slow the spread of COVID-19 and protect people, property, and businesses. Unprecedented directives were issued, requiring certain businesses to close and requiring residents to remain in their homes unless performing "essential" activities.

72.    On January 31, 2020, the United States Department of Health and Human Services declared that a public health emergency existed nationwide because of confirmed cases of COVID-19 in the United States.

73.    Beginning in early March 2020, U.S. state and local governments issued orders suspending or severely curtailing the operations of all "non-essential" or "high risk" businesses in response to the virus and/or risks created by virus. This included properties such as those owned and operated by Menchies.

74.    On or about March 2020, states, counties, and cities where Menchies' insured properties are located declared states of emergency to help prepare for broader spread of COVID-19.

75.    On or about March 2020, states, counties, and cities where Menchies' insured properties are located issued orders requiring businesses to operate their properties and conduct their operations on those premises so as to reduce their customer occupancy by a significant percentage.

76.    Because of the danger posed by COVID-19 and its spread as described above, Menchies also determined that closure was necessary to slow the spread of COVID-19 as a result of infected persons on the properties or from those who would enter the properties.

77.    Other states, and county and city officials have issued similar orders throughout the United States referencing physical property loss or damage or imminent threatened physical property loss or damage from the virus.

78.    A motivating factor behind these orders was to protect persons and property from direct physical loss of or damage to property (or both) caused by SARS-CoV-2 and COVID-19.

79.    The vast majority of those individuals would spend time indoors at Menchies' properties, given the nature of the businesses.

80.    Given the number of infected individuals, it is a virtual certainty that infected individuals, both symptomatic and asymptomatic, were present in Menchies' properties on a daily basis and would have been present daily in Menchies' properties in an ever-increasing number in the absence of the issuance of governmental orders.

81.    Exhalation by these infected individuals when coughing, sneezing, talking, laughing, and even simply breathing created respiratory droplets and aerosolized particles containing the SARS-CoV-2 virus that were inhaled into the noses, mouths, and lungs of other individuals and deposited on surfaces within Menchies' properties where later contact by uninfected individuals undoubtedly resulted in transmission of SARS-CoV-2 to those individuals.

82.    Each visit by an individual, whether symptomatic or asymptomatic, infected with SARS-CoV-2 resulted in either the actual or an imminent threat of deposition and transmission of the SARS-CoV-2 into the air and onto the surfaces within Menchies' properties, threatening both accidental contamination and food contamination.

83.     For the reasons described above, COVID-19 and the governmental orders caused a total or partial prohibition of access to Menchies' properties as well as partial or total interruption of Menchies' business operations. The direct physical loss of or damage to property (or both) caused by COVID-19 and/or the orders and the further direct physical loss of or damage to property (or both), including contamination and food contamination, threatened by COVID-19 have combined to devastate Menchies business operations.

## V.     MENCHIES SUFFERED AND CONTINUES TO SUFFER COVERED LOSSES

84.     The SARS-CoV-2 virus is a covered cause of loss, because it is a risk of physical loss or damage, and not otherwise excluded under the All Risk Policies.

85.     The issuance of the above-referenced closure orders by state, county, and city officials is a covered cause of loss because it is a risk of physical loss or damage, and not otherwise excluded under the All Risk Policies.

86.     Whether the SARS-CoV-2 virus and/or the above-referenced orders caused Menchies' losses and expenses presents a factual question that is inappropriate for resolution at the motion to dismiss stage.

87.     The SARS-CoV-2 virus and/or the above-referenced orders issued by state, county, and city officials have directly impacted Menchies' properties, which do not qualify as essential businesses. The damage and far-reaching restrictions and prohibitions on the activities that can be conducted at Menchies' properties, and restoration efforts necessary to rid the premises of COVID-19, have been catastrophic for Menchies' properties — interrupting its operations so pervasively as to effectively force it to close, thereby enduring a prolonged curtailment of earnings that threatens its survival.

88.     Menchies' properties were frequented by thousands of individuals a day, including patrons, employees, vendors, and other individuals carrying SARS-CoV-2 and COVID-19. In

addition to breathing SARS-CoV-2 and COVID-19 into the air, these individuals touched countless surfaces in Menchies insured premises, including walls, furniture, doors, tables, and other surfaces on the floors, restrooms, and other areas on the premises.

89.    The thousands of individuals that frequent Menchies' properties daily, ranging from guests, patrons, vendors and many others, are carrying or otherwise exposed to SARS-CoV-2 and COVID-19 and would have been in contact with each other, furniture, doors, and other surfaces on the floors, restrooms, and other areas on the premises.

90.    As a result of the pervasive impacts on Menchies' property, Menchies was forced to close and to repair the insured properties, including restoration efforts to rid the premises of and attempt to protect against further physical loss and/or damage SARS-CoV-2. As a result, Menchies suffered a complete loss of use of its business premises and the properties were unfit for use for their intended purposes.

**A. Menchies Suffered "Accidental Contamination" and "Food Contamination" as Defined in the Policies.**

91.    In addition to the above-referenced cause of loss, Menchies' operations were suspended and Menchies suffered significant losses due to "accidental contamination" and "food contamination" as these terms are defined in the Policies.

92.    More specifically, Menchies' products were exposed to and contaminated by SARS-CoV-2 and COVID-19 though employees and guests carrying or otherwise exposed to SARS-CoV-2 and COVID-19

93.    Toppings for Menchies' frozen yogurt are stored in open containers, as in the image below, that are accessible to both employees and customers.  Customers take the toppings they desire from the container to put on their frozen yogurt.  During this process the toppings are exposed to the air as well as exhalation by the customers and employees.



94.    COVID-positive Menchies employees were present at numerous locations.  These confirmed COVID positive employees handled the toppings.  Likewise, given the ubiquity of the virus, it is certain that COVID positive patrons also handle the toppings.

95.    In each of these instances, Menchies property and food products suffered accidental contamination and food contamination as defined in the Policies due to their exposure to COVID positive employees and customers.

96.    Due to the ubiquity and danger of the virus and physical virus particles, even where no positive testing or self-reported illness from guests or employees were received, Menchies property and food products suffered accidental contamination and food contamination as defined in the Policies.

97.     Menchies products and Menchies' property that suffered accidental contamination and food contamination as described in the Policies include, without limitation, toppings and yogurt products.

98.     Because of these known COVID positive employees or potentially exposed guests carrying or otherwise exposed to SARS-CoV-2 and COVID-19, and the danger and ubiquity of virus particles in the environment, including Menchies' business premises, Menchies was forced to destroy significant amounts of products at all Menchies retail locations.

99.     As a result of this contamination, and in an abundance of caution for public safety, Menchies was forced to direct all its stores to dispose of any exposed products including, but not limited to, toppings and yogurt products.

100.    Menchies has also been forced to pay decontamination costs, covered under the Policies, to repair the physical damage caused by COVID-19. It became clear that Menchies' insured properties were inoperable and unusable without the alterations necessary to protect the safety of its visitors, guests, and employees. These decontamination costs also were necessary to comply with the emergency directives, laws, and/or ordinances promulgated by governmental authorities and the CDC, among others. None of these costs would have been incurred but for the impacts of the COVID-19 pandemic and the resulting closure orders.

101.    In addition to decontamination costs, Menchies has incurred significant losses and extra expense in nearly all aspects of its business. Again, none of these expenses would have been incurred but for the impacts of the COVID-19 pandemic and the resulting closure orders.

102.    Physical SARS-CoV-2 virus particles and/or the above-referenced closure orders issued by state, county, and city officials have caused physical loss or damage to property

Menchies depends on to attract business to its insured properties, which are within one mile of the insured properties.

103.    Menchies' properties are within five miles of many significant attractions, restaurants, stores, cafes, bars, parks, and hotels that have also suffered and continue to suffer physical damage due to the SARS-CoV-2 virus and/or closure orders. Many of these attractions, restaurants, stores, cafes, bars, parks, and hotels almost certainly suffered alteration of their premises and contents as a result of the virtually certain and ubiquitous presence of SARS-CoV-2 due to gathering of people affected by COVID-19, whether symptomatic or asymptomatic.

104.    These impacts on property directly reduced Menchies' ability to operate and use its property for purposes that were restricted by government order and intended for purposes that were made impossible due to the presence of communicable disease. As a direct result, Menchies sustained a significant financial loss across its business due to the interruption of business and extra expenses incurred.

105.    The above-referenced orders, issued as a direct result of the physical damage described above, have operated to prohibit access to Menchies' properties and the immediate surrounding businesses, properties, and areas.

106.    The SARS-CoV-2 virus and/or the above-referenced closure orders have also caused Menchies to suffer interruption of business operations resulting from Menchies taking reasonable and necessary action for the temporary protection and preservation of its insured properties, to prevent immediately impending insured physical loss or damage to its insured properties.

107.    The SARS-CoV-2 virus and/or the above-referenced closure orders have further caused Menchies to suffer loss of earnings directly resulting from physical loss or damage to property at the premises of Menchies' suppliers, customers, and/or contract service providers.

## VI.    THE INSURANCE COVERAGE PURCHASED BY MENCHIES

108.    Menchies and its property described in the policy, is protected by the Restaurant Recovery Policy sold to Menchies by HCC for the time period October 14, 2019, to October 14, 2020. See Exhibit A.

109.    Menchies and its properties, listed in the Location Schedules and described in the policies, are protected by the All Risk Policy sold to Menchies by MB for the time period August 28, 2019, to August 28, 2020. See Exhibit B.

110.    Menchies is a Named Insured under both Policies.

111.    Menchies paid all premiums due to Defendants to purchase the Policies and otherwise complied with all applicable terms and conditions of coverage.

112.    The Policies provides a maximum limits of liability, with various sublimits and time limits. Claims are subject to a deductible, which is far exceeded by Menchies' covered loss.

113.    Occurrence is defined as "the sum total of all loss or damage of the type insured, including any insured Business Interruption loss, arising out of or caused by one discrete event of physical loss or damage . . . ."

114.    Shortly after Menchies ceased business operations, Menchies' losses far exceeded the deductible under the Policies.

115.    The Restaurant Recovery Policy provides specific coverage for specific risks contemplated by Menchies, including "accidental contamination."

116.    The All-Risk Policy provides coverage not only for "food contamination" but also for "all risks"—the broadest insurance coverage available to policyholders for protection of their

property interests, including protection against disruption to their business operations. Under an all-risk policy, the insured's burden to obtain coverage for a loss is very limited—the insured needs only to show that its loss occurred and that the loss was fortuitous. The burden then shifts to the insurer to show that a clear, express, and unambiguous exception or exclusion in the policy bars or limits coverage. The All Risk Policy also contains a specific coverage for food contamination.

117.    The damages, Business Interruption loss, Extra Expense, and other losses incurred and continuing to be incurred by Menchies are covered under the All Risk Policy and the Restaurant Recovery Policy sold to Menchies.

118.    Menchies gave timely notice of its claims and has satisfied, is excused from performing, or Defendants have waived or is estopped from insistence upon performance of, all conditions of the Policies.

## VII.    MULTIPLE COVERAGES ARE TRIGGERED UNDER THE ALL RISK POLICY

119.    In addition to triggering the policies' "all risk" Property Damage and Business Interruption coverages, Menchies' claims also trigger multiple "Additional Coverages" and "Coverage Extensions" provided under the All Risk Policy.

### A.    Menchies sustained losses and expenses caused by the suspension of its operations resulting from covered direct physical loss of or damage to Menchies' insured properties

120.    The All Risk Policy begins with clear obligations to cover properties against all "risk of physical loss or damage" except to the extent coverage is excluded.

121.    The All Risk Policy does not define the phrase "physical loss or damage of the type insured: 1. To property…;"

122.    The presence of the disjunctive "or" in "physical loss or damage to property" means that coverage is triggered if *either* a physical loss of property or damage to property occurs.

123.    SARS-CoV-2 or SARS-CoV-2-containing fomites, respiratory droplets, and droplet nuclei physically alter the air and airspaces they enter and the property to which they adhere, attach or come in contact, including without limitation, by physically altering the surfaces of those properties and by making air inhalation or physical contact with those previously safe, inert air and air spaces inside the properties and the properties dangerous.

124.    When individuals carrying SARS-CoV-2 breathe, talk, cough, or sneeze, they expel aerosolized droplet nuclei that remain in the air and, like dangerous fumes, make the premises unsafe and affirmatively dangerous as SARS-CoV-2 physically alters the air. Air inside buildings that was previously safe to breathe, but can no longer safely be breathed due to SARS-CoV-2 and COVID-19, has undergone a physical alteration.

125.    In addition, the presence of SARS-CoV-2 and COVID-19, including but not limited to SARS-CoV-2 droplets or droplet nuclei on solid surfaces and in the air at insured property, also has caused and will continue to cause direct physical damage to physical property and ambient air at the premises. SARS-CoV-2, a physical entity, has attached and adhered to Menchies' insured properties and by doing so, altered those properties. This has directly resulted in loss of use of those properties and the properties are unusable without substantial physical alteration.

126.    Given published reports about SARS-CoV-2 and the outbreak of the pandemic, it is likely that persons who were pre-symptomatic or asymptomatic and unknowingly carrying SARS-CoV-2, including but not limited to patrons, visitors, and employees were present at Menchies' properties.

127.    SARS-CoV-2 droplets have been conveyed from infected persons (whether symptomatic, pre-symptomatic, or asymptomatic) to solid surfaces, including but not limited to furniture, doors, floors, bathroom facilities, and supplies, and into the air and HVAC systems at

Menchies' properties, causing damage and alteration to physical property and ambient air at the premises. Aerosolized SARS-CoV-2 has entered the air in Menchies' properties.

128.    Menchies sustained actual loss, including but not limited to substantial sums spent to remediate physical damage to its property, such as for cleaning and disinfecting premises, repairing or replacing air filtration systems, remodeling and reconfiguring physical spaces, and other measures to reduce or eliminate the presence of the SARS-CoV-2 on its properties. Such remediation measures have been ongoing because of the continuous and repeated recurrence of SARS-CoV-2 while the pandemic persists.

129.    In addition to physical damage, Menchies' insured properties also have suffered direct physical loss. The on-site SARS-CoV-2, fomites, and respiratory droplets or droplet nuclei containing SARS-CoV-2 have attached to and deprived, partially and totally, Menchies of the physical use of its insured properties by making them unsafe and unusable and thereby lost.

130.    These direct physical losses to Menchies' insured properties include without limitation the rendering of its insured property from a satisfactory state to a state dangerous and/or unsatisfactory for use because of the fortuitous presence and effect of SARS-CoV-2, fomites, and respiratory droplets or droplet nuclei directly upon the property.

131.    These direct physical losses to Menchies' insured properties include without limitation the direct physical loss of the ability to use Menchies' properties for their primary functions.

132.    Menchies also has incurred substantial costs in an attempt to mitigate the suspension of its business operations, including without limitation expenses incurred for reconfiguration, to the extent possible. Menchies would not have incurred those costs but for either direct physical loss of or damage to property (or both) caused by SARS-CoV-2 and COVID-19.

B.  **Menchies has sustained actual losses and incurred extra expenses insured by the All Risk Policy's Business Interruption coverages**

133.    As part of the protection from "all risk," the All Risk Policies contain "Business Interruption" coverage for Gross Earnings and Extended Period of Liability or Gross Profit (at Menchies' option) "as a direct result of physical loss or damage of the type insured" to Menchies' properties during the "Period of Liability." Under Gross Earnings and Gross Profit, the amount payable as indemnity thereunder includes "ordinary payroll."

134.    The Business Interruption coverages include "expenses reasonably and necessarily incurred by the Insured to reduce the loss otherwise payable under this Policy."

135.    The Business Interruption coverages include Extra Expense coverage.

136.    The onset of COVID-19, the ensuing closure orders, direct physical loss of or damage to property (or both) caused by SARS-CoV-2 and COVID-19, and the effects of all of these (including restoration efforts to rid the premises of COVID-19) on Menchies' businesses triggered the All Risk Policy's Business Interruption coverages. Menchies paid substantial premium in anticipation of those coverages being provided.

C.  **Menchies has sustained actual losses and incurred extra expenses insured by the All Risk Policy's Civil or Military Authority coverages**

137.    The All Risk Policy affords Business Interruption Coverage Extension for Civil or Military Authority.

138.    Menchies has sustained actual loss and incurred Extra Expense because state and local authorities governing the locales in which Menchies insured properties are situated, have issued orders that impair, limit, restrict, or prohibit partial or total access to insured properties.

139.    These civil or military orders limiting, restricting, prohibiting, or impairing access to Menchies' insured properties have all been issued as a direct result of, among other things, direct physical loss of or damage to property (or both) caused by the SARS-CoV-2 and COVID-19,

including but not limited to physical damage either at insured locations or within five statute miles thereof. This direct physical damage is caused by the physical presence of, and structural damage caused by, SARS-CoV-2 and COVID-19 on furniture, doors, floors, bathroom facilities, and supplies; and in the air within the insurer properties, including offices, restrooms, and HVAC systems. Such direct physical loss of or damage to property (or both) is of the type insured by the All Risk Policy generally as well as by the Civil or Military Authority coverage provisions specifically.

140.    Numerous outbreaks of COVID-19 in the vicinities of Menchies' properties have led to numerous discrete direct physical loss of or damage to property (or both) at or within five statute miles of the insured locations, and those losses or damages have in turn led to numerous discrete civil or military orders limiting, restricting, impairing or prohibiting access to insured locations. Certain civil or military orders that purport to prevent against future proliferation of SARS-CoV-2 and future transmission of COVID-19 are the direct result of direct physical loss of or damage to property (or both) of the type insured. Such direct physical loss of or damage to property (or both) is of the type insured by the All Risk Policy generally as well as by the Civil or Military Authority coverage provisions specifically.

**D.**   **Menchies has sustained actual losses and incurred extra expenses insured by the All Risk Policy's Contractual Penalties coverages**

141.    The All Risk Policy affords Business Interruption Coverage Extensions for Contractual Penalties suffered by Menchies.

142.    The Contractual Penalties provision states: "We will pay for contractual penalties you are required to pay due to your failure to provide your product or service according to contract terms because of direct physical loss or damage by a Covered Cause of Loss to Covered Property."

143.    Menchies has incurred contractual penalties directly resulting from direct physical loss of or damage (or both) of the type insured to property of the type insured at insured locations described in this coverage extensions due to its failure to provide its product or service according to contract terms with third parties. This includes direct physical loss of or damage to property (or both) due to the presence of SARS-CoV-2, time element losses and extra expense due to orders of civil authority, and the impact of the COVID-19 pandemic.

144.    Menchies has taken reasonable and necessary steps to mitigate its contractual penalties.

E.    **Menchies has sustained actual losses and incurred extra expenses insured by the All Risk Policy's "Gold Property Broadening Endorsement," including Food Contamination.**

145.    The All Risk Policy includes a "Gold Property Broadening Endorsement." This coverage extends to "Food Contamination."

146.    The "Food Contamination" provision states in relevant part:

(1) If your business at the described premises is ordered closed by the Board of Health or any other governmental authority as a result of the discovery of "food contamination", we will pay:

(a) Your expense to clean your equipment as required by the Board of Health or any other governmental authority;

(b) Your cost to replace the food which is, or is suspected to be contaminated;

(c) Your expense to provide necessary medical tests or vaccinations for your infected "employees". However, we will not pay for any expense that is otherwise covered under a Workers' Compensation Policy;

(d) The loss of Business Income you sustain due to the necessary "suspension" of your "operations". The coverage for Business Income will begin 24 hours after you receive notice of closing from the Board of Health or any other governmental authority;

147. For the reasons described above, the direct physical loss of and damage to Menchie's properties has triggered the coverages contained in the "Gold Property Broadening Endorsement" of the MB All Risk Policy. Menchies has sustained actual loss and has incurred extra expense directly resulting from direct physical loss of or damage (or both) of the type insured to property of the type insured at insured locations described in this coverage endorsement.

148. Among other things, the disease caused by SARS-CoV-2 is a communicable disease transmitted by human contact and Menchies' business locations were ordered to be closed by numerous orders of governmental authorities that related to the dangers of SARS-CoV-2, including the discovery of ubiquitous dangerous conditions that actually or are suspected to cause contamination of food and products, resulting in substantial costs to replace products, undertake cleaning testing, and loss of business income due to suspension of the business.

**F.** **Menchies has sustained actual losses and incurred extra expenses insured by the HCC All Risk Policy's Accidental Contamination Coverage.**

149. The Restaurant Recovery Policy includes coverage for "Accidental Contamination."

150. Under the Accidental Contamination provision, the Restaurant Recovery Policy provides coverage for:

> Any accidental or unintentional contamination, impairment or mislabeling of an *Insured Product(s),* which occurs during or as a result of its production, preparation, manufacture, packaging or distribution -- provided that the use or consumption of such *Insured Product(s)* has resulted in or would result in clear, identifiable, internal or external visible physical symptoms of bodily injury, sickness, disease or death of any person(s), within three hundred and sixty five (365) days following such consumption or use.

151. For the reasons described above in relation to "Food Contamination" described in the All-Risk Policy, "Accidental Contamination" has also occurred in relation to the Restaurant Recovery Policy.

152.    As a result of Accidental Contamination, Menchies has sustained actual loss and has incurred extra expense and business interruption losses directly resulting from direct physical loss of or damage (or both) of the type insured to property of the type insured at insured locations described in this coverage endorsement.

**G.  No exclusions apply to Menchies' losses and damages**

153.    No exclusions under the Policies unambiguously preclude coverage for Menchies' claims. And, more specifically, no exclusions unambiguously preclude coverage for direct physical loss of or damage to property (or both) from the effects of the COVID-19 pandemic, physical damage from dangerous SARS-CoV-2 particles, and the ensuing closure orders and emergency directives.

154.    No virus or similar exclusion applies to the damage and loss at issue here. Any virus or contamination exclusion is applicable to environmental pollution and intentional acts, not pandemics beyond a policyholder's control.

155.    Neither Policy contains a specific applicable exclusion involving a pandemic, which was available to the insurance company but not used in the policy.

156.    The Policies provide express coverage for accidental contamination or food contamination that are inconsistent with any exclusion.

157.    Any potentially applicable exclusion in the All-Risk Policy is ambiguous due to other coverages expressly provided by the All-Risk Policy, and ambiguous in relation to losses involving governmental orders that close or restrict businesses on a widespread scale due to a natural disaster, for which the policy provides coverage.

158.    MB is estopped from relying on any virus exclusion in the All-Risk Policy based on regulatory representations made on its behalf to state insurance regulators in 2006, indicating that the exclusion when newly introduced was not a reduction in existing coverage.

159.     Defendants knew how to draft an exclusion specifically excluding losses or damage arising from a pandemic. The risks associated with viruses and pandemics have been known to the insurance industry for a century and have been well known to Defendants in recent decades during which we all have witnessed outbreaks and pandemics involving viruses such as SARS, MERS, H1N1, and Zika.

160.     Because these risks are well known, there are exclusions in common usage in the insurance industry that specifically reference losses caused by pandemics. However, Defendants did not include such specific pandemic exclusions as part of the Policies they sold to Menchies.

## VIII.    DEFENDANT'S IMPROPER DENIAL OF MENCHIES' CLAIMS

161.     Menchies has sustained actual loss and has incurred extra expense directly resulting from direct physical loss of or damage to property (or both) of the type insured under the All Risk Policies. No exclusions under the All Risk Policies apply to preclude coverage for Menchies' claims. As a result, Menchies promptly notified Defendants of its claims for losses under the Policies.

162.     At no time subsequent to Menchies providing notice to Defendants of the claims has either Defendant, or its representatives, requested to access, inspect, and/or test the properties at issue.

163.     Rather, Defendants preemptively sought to limit Menchies' coverage.

164.     In its letter denying coverage to Menchies, Defendant MB concluded that there was no physical damage to the property to trigger business income or civil authority coverage. Defendant MB further asserted that coverage is preclude by the exclusion language pertaining to virus and bacteria.

165.     Defendant MB waived any additional grounds to contest Menchies' claims under governing law that were not timely reserved by Defendant MB in writing.

166.    Defendants have substantially performed or otherwise satisfied all conditions precedent to bringing this action and obtaining coverage pursuant to the All Risk Policies and applicable law, or alternatively, Menchies has been excused from performance by Defendants' acts, representations, conduct, or omissions.

## IX.    DEFENDANTS' DUTIES PURSUANT TO GOVERNING LAW

167.    State insurance law requires that insurance companies act in good faith, abstain from deception and practice honesty and equity in all insurance matters. The business of insurance is affected by the public interest and engaging in the business of insurance requires insurers like Defendants to promptly conduct fair, balanced, and thorough investigations of all bases of claims for benefits made by their insureds, with a view toward honoring the claims. As part of these obligations, an insurance company is obligated to diligently search for and consider evidence that supports coverage of the claimed loss, and in doing so must give at least as much consideration to the interests of its insured as it gives to its own interests.

168.    Defendants have a duty to adopt and maintain a consistent and rational interpretation of the Policies sold to Menchies.

169.    Defendants are bound to interpret and administer its insurance policies in accordance with the requirements of governing state law.

170.    156.    Defendants are bound to investigate Menchies' claims in good faith and with an individualized investigation into the cause of loss.

171.    Defendants have failed to honor their obligations under the Policies and governing law to Menchies. As described in greater detail below, Defendants denied coverage and breached (a) the Policies sold to Menchies and (b) the duties of good faith and fair dealing owed to Menchies. These breaches have caused great and incalculable damages to Menchies. Defendants have threatened to violate and have violated their fiduciary duties to Menchies.

172.     Defendants' breach of their duties under the Policies and as prescribed by law have caused Menchies to continue to incur losses that were unpaid by Defendants, but should have been compensated under the Policies, thereby foreseeably placing Menchies in the position necessitating the filing of this lawsuit. Defendants reasonably foresaw this circumstance as a result of its failure to pay Menchies for its insured loss and are therefore responsible for the additional consequential damages caused to Menchies by that breach.

## FIRST CAUSE OF ACTION
### (For Declaratory Relief against Defendants)

173.     Menchies incorporates by reference the allegations contained in the preceding paragraphs.

174.     Menchies seeks a declaration of the parties' rights and duties under the Policies.

175.     Actual and justiciable controversies exists between Menchies and Defendants regarding the interpretation of the Policies.

176.     The controversies between Menchies and Defendants are ripe for judicial review.

177.     The controversies are of sufficient immediacy to justify the issuance of declaratory relief.

178.     Menchies accordingly seeks a declaration from the Court that:

(a)     Each coverage provision identified in the Complaint is triggered by Menchies' claims;

(b)     No exclusion in the Policies applies to preclude or limit coverage for Menchies' claims;

(c)     Menchies has satisfied or been excused from satisfying, or Defendants have waived or are estopped from enforcing, all conditions precedent under the Policies; and

(d)     The award of such additional relief as the Court deems just and appropriate.

### SECOND CAUSE OF ACTION
### (Damages for Breach of Contract against Defendants)

179.    Menchies incorporates by reference the allegations contained in the preceding paragraphs.

180.    As set forth above, Defendants breached the Policies by refusing to honor the express terms of the Policies and refusing to pay Menchies amounts due under the terms of the Policies.

181.    As a direct result of Defendants' breaches, Menchies has suffered, and continues to suffer, substantial direct monetary damages in an amount to be established at trial, but no less than $4,000,000, including consequential damages, and is also entitled to pre judgment and post judgment interest, reasonable attorneys' fees, and costs incurred by Menchies in bringing this action.

182.    These damages are foreseeable damages incurred by Menchies as a direct result of Defendants' wrongful conduct, which were contemplated by the parties when they negotiated and executed the Policies, and should be awarded so that Menchies is adequately compensated for Defendants' wrongful conduct.

183.    Menchies' losses as a result of Defendants' breaches of contract are continuing, and Menchies reserves the right to seek the full and exact amount of its damages at the time of trial.

### JURY DEMAND

184.    Menchies hereby demands a trial by jury on all causes of action.

### PRAYER

WHEREFORE, Menchies seeks judgment in its favor as to Count II as follows:

a)    The entry of an award requiring Defendants to pay Menchies all monetary damages suffered by Menchies caused by Defendants' breaches, including,

without limitation, compensatory damages, consequential damages, pre-judgment interest, post judgment interest, attorneys' fees, and costs; and

b)    The award of such additional relief as the Court deems just and appropriate.

Dated: September 13, 2022                    Respectfully submitted,

REED SMITH LLP

By: /s/John N. Ellison_____
    John N. Ellison
    Anthony B. Crawford
    599 Lexington Avenue
    New York, NY 10022
    jellison@reedsmith.com
    acrawford@reedsmith.com
    (212) 205-6063

    *Attorneys for Plaintiffs, Menchies Group, Inc.*