USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 8/31/2023

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MENCHIES GROUP, INC.,<br><br>      Plaintiff,<br><br>-against-<br><br>MASSACHUSETTS BAY INSURANCE COMPANY D/B/A HANOVER INSURANCE COMPANY, and HOUSTON CASUALTY COMPANY,<br><br>      Defendants. | 1:22-cv-04237-MKV<br><br>**MEMORANDUM OPINION AND ORDER GRANTING MOTION TO DISMISS BY DEFENDANT MASSACHUSETTS BAY AND GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS BY DEFENDANT HOUSTON CASUALTY** |

MARY KAY VYSKOCIL, United States District Judge:

  Plaintiff Menchies Group, Inc. ("Menchies") brings this action against its insurers, Massachusetts Bay Insurance Company ("Mass Bay") and Houston Casualty Company ("HCC"), seeking payments for business losses resulting from COVID-19 and related government restrictions. Each Defendant moves to dismiss the claims asserted against it pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons below, Mass Bay's motion to dismiss is GRANTED, and HCC's motion to dismiss is GRANTED IN PART and DENIED IN PART.

## BACKGROUND[1]

  Menchies owns and operates frozen yogurt shops throughout the United States. Amended Complaint ¶ 2 [ECF No. 20] ("Am. Compl."). Menchies purchased an "All Risk Policy" from Mass Bay that provided property insurance and related coverage from August 28, 2019 to August 28, 2020 (the "Mass Bay Policy" or "MB Policy"). *See* Am. Compl. Ex. A [ECF No. 20-1]. Menchies also purchased a "Restaurant Recovery Policy" from HCC, providing coverage from

---

[1] The facts are taken from the Amended Complaint, and for purposes of this motion, are accepted as true. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court also relies on the insurance contracts attached to, and incorporated by reference in, the Amended Complaint. *See Kleinman v. Elan Corp.*, 706 F.3d 145, 152 (2d Cir. 2013).

October 14, 2019 to October 14, 2020 (the "HCC Policy"). *See* Am. Compl. Ex. B [ECF No. 20-2].

### I. Mass Bay's All-Risk Policy

The Mass Bay Policy insured ten of Menchies' properties (the "Covered Property") against a wide range of property losses. MB Policy 24; *see generally* MB Policy.[2] Relevant here, the MB Policy contains a "Building and Personal Property Coverage Form," providing coverage "for *direct physical loss of or damage* to [the] Covered Property." MB Policy 236 (emphasis added). The Mass Bay Policy also insures against "the actual loss of Business Income [sustained] due to the necessary suspension of [Menchies'] operations during [a] period of restoration," where the "suspension [is] caused by *direct physical loss of or damage to*" the Covered Property. MB Policy 252 (emphasis added).[3] In addition, the Policy provides coverage for "Extra Expense[s]" that Menchies "would not have incurred if there had been *no direct physical loss or damage* to property." MB Policy 252 (emphasis added).

The Mass Bay Policy includes a general virus exclusion (the "Virus Exclusion"), stating that Mass Bay "will not pay for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease." MB Policy 278.

The Mass Bay Policy also includes a coverage extension for instances of food contamination (the "Food Contamination Provision"). That provision—which does *not* include any express requirement of "direct physical loss or damage to property"—provides limited

---

[2] Pincites to the Mass Bay Policy and HCC Policy refer to PDF pagination. Unless otherwise noted, emphases and quotation marks originally included in the language of the Policies are omitted.

[3] The Policy defines the "period of restoration" as beginning on the date of "direct physical loss" and ending "when the property should be repaired, rebuilt, or replaced" or when "business is resumed at a new permanent location." MB Policy 260.

coverage of up to $25,000 where Menchies "is ordered closed by the Board of Health or any other governmental authority as a result of the discovery of 'food contamination.'" MB Policy 149. "Food contamination" is defined as "an incidence of food poisoning to one or more of [Menchies'] customers" as a result of tainted food, food which has been improperly stored, handled, or prepared, or a "'communicable disease' transmitted through one or more of [Menchies'] employees." MB Policy 174. "Communicable disease" is defined as "a bacterial microorganism transmitted through human contact with food." MB Policy 171.

## II.     HCC's Restaurant Recovery Policy

The HCC Policy insures Menchies against losses "caused by or resulting from" one of four "Insured Events." HCC Policy 9. One Insured Event, "Accidental Contamination," is relevant here. HCC Policy 9. "Accidental Contamination" is defined as:

> [A]ny actual accidental or unintentional contamination, impairment or mislabeling of an Insured Product(s), which occurs during or as a result of its production, preparation, manufacture, packaging or distribution – provided that the use or consumption of such Insured Product(s) has resulted in or would result in clear, identifiable, internal or external visible physical symptoms of bodily injury, sickness, disease or death of any person(s), within three hundred and sixty five (365) days following such consumption or use.

HCC Policy 9. The "Insured Products" are defined as "all ingestible products for human consumption, or any of their ingredients or components . . . that have been reported to the Insurer . . . and that are in production; or have been manufactured, handled or distributed by the Insured; or manufactured by any contract manufacturer for the Insured." HCC Policy 13.

## III.    Menchies' Claim for Coverage

Beginning in March 2020, Menchies alleges that the COVID-19 pandemic "had an unprecedented and catastrophic effect on [its] properties and business operations, causing millions of dollars in losses." Am. Compl. ¶ 3. The exhaustive 184-paragraph Amended Complaint

3

outlines at least three ways Menchies was impacted by the pandemic. *First*, Menchies alleges that SARS-CoV-2 and COVID-19[4] "caused direct physical loss of or damage to [its] properties . . . by altering [their] physical conditions . . . so that they were no longer safe or fit for occupancy or use and/or permitted to be used." Am. Compl. ¶ 6. As a result, Menchies contends that its "properties required substantial physical alterations and other protective measures," which "forced [Menchies] to close and to repair the insured properties." Am. Compl. ¶¶ 5, 90. *Second*, Menchies alleges that various "governmental orders caused a total or partial prohibition of access to Menchies' properties as well as partial or total interruption of Menchies' business operations." Am. Compl. ¶ 83. *Finally*, Menchies contends that its "products were exposed to and contaminated by SARS-CoV-2 and COVID-19 through employees and guests carrying" the virus, necessitating that it "destroy significant amounts of products at all Menchies retail locations." Am. Compl. ¶¶ 92, 98.

Menchies submitted claims for coverage under the Mass Bay and HCC Policies, both of which were denied. Am. Compl. ¶¶ 1, 118, 171. Menchies then initiated this action by filing a complaint in Texas state court, seeking declaratory relief and damages for breach of contract. *See* Original Petition for Declaratory Judgment and Breach of Contract [ECF No. 1-3]. Mass Bay subsequently removed the action to the United States District Court of the Southern District of Texas. *See* Notice of Removal [ECF No. 1]. The parties then jointly moved to transfer the case to this District, *see* Joint Motion to Transfer [ECF No. 3], which was granted by Chief Judge Rosenthal. *See* Order [ECF No. 4].

Defendants separately moved to dismiss. *See* Mass Bay's Motion to Dismiss [ECF No. 25]; Mass Bay's Memorandum of Law in Support [ECF No. 26] ("MB Mem."); HCC's Motion to

---

[4] SARS-CoV-2 is the virus that causes the disease COVID-19. *See* Ctrs. for Disease Control and Prevention, *SARS-CoV-2 Variant Classifications and Definitions* (Mar. 20, 2023), https://www.cdc.gov/coronavirus/2019-ncov/variants/variant-classifications.html. For ease of reference, this Opinion refers simply to the COVID-19 virus.

4

Dismiss [ECF No. 21]; HCC's Memorandum of Law in Support [ECF No. 22] ("HCC Mem."). Menchies opposed both motions. *See* Memorandum of Law in Opposition [ECF No. 29] ("Pl. MB Opp."); Memorandum of Law in Opposition [ECF No. 28] ("Pl. HCC Opp."). Defendants replied. *See* Mass Bay's Reply Memorandum of Law [ECF No. 32] ("MB Reply"); HCC's Reply Memorandum of Law [ECF No. 33] ("HCC Reply"). Menchies moved for oral argument. *See* Letter Motion [ECF No. 31].

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, the Amended Complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While the Court "must accept as true all of the allegations contained in a complaint," this "tenet . . . is inapplicable to legal conclusions" and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

In deciding a motion to dismiss, this Court may consider "documents attached to the complaint as an exhibit or incorporated in it by reference, matters of which judicial notice may be taken, or documents . . . of which plaintiffs had knowledge and relied on in bringing suit." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (cleaned up).

## ANALYSIS

### I. Mass Bay's Motion to Dismiss is Granted

Mass Bay contends that Menchies "do[es] not meet the threshold burden for coverage" under its Policy because there is no allegation of "direct physical loss of or damage to" any insured

property. MB Mem. 1. Mass Bay further argues that even assuming Menchies did demonstrate physical loss or damage, the Virus Exclusion bars coverage. *See* MB Mem. 24–26. Additionally, Mass Bay argues that Menchies' claim for coverage under the limited Food Contamination Provision "falls leaps and bounds short of a sufficiently pled claim." MB Mem. 33. Menchies in contrast, argues that its inability to use its properties safely during the pandemic constitutes physical loss or damage, that the Virus Exclusion does not bar coverage, and that the Food Contamination Provision is applicable. *See* Pl. MB Opp. 7–15, 16–17, 18–19.

The parties agree that California law applies to the interpretation of the Mass Bay Policy, *see* MB Mem. 12–13; Pl. MB Opp. 7–8, which "is sufficient to establish choice of law." *Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000) (citation omitted).

    1.    <u>*Menchies Does Not Allege Direct Physical Loss or Damage*</u>

Menchies raises three theories to support its contention that it experienced direct physical loss or damage under California law. None are successful.

    a.    *Interruption to Menchies' Business Operations*

First, Menchies argues that it experienced direct physical loss or damage because it was deprived of the ability to use its properties as intended—either because of government orders or, more generally, because of the presence of the COVID-19 virus—and that its business operations were interrupted as a result. *See* Am. Compl. ¶ 83. In either case, a California appellate court has explained that the "mere loss of use of physical property to generate business income, without any other physical impact on the property, *does not* give rise to coverage for direct physical loss." *Inns-by-the-Sea v. Ca. Mut. Ins. Co.*, 286 Cal. Rptr. 3d 576, 591, 71 Cal. App. 5th 688, 705–06 (Cal. Ct. App. 2021) (emphasis added). Indeed, the court explained, "[t]he requirement that the loss be 'physical' . . . is widely held to exclude alleged losses that are intangible or incorporeal and,

thereby, to preclude any claim against the property insurer when the insured merely suffers a detrimental economic impact unaccompanied by a distinct, demonstrable, physical alteration of the property." 286 Cal. Rptr. 3d at 591, 71 Cal. App. 5th at 706 (emphasis omitted). Similarly, in *Mudpie, Inc. v. Travelers Casualty Insurance Company of America*, 15 F.4th 885 (9th Cir. 2021), the Ninth Circuit, interpreting California law, rejected the plaintiff's contention that "direct physical loss of or damage to" property "merely require[d] that the property no longer be suitable for its intended purpose." *Id.* at 891. Instead, the Ninth Circuit held that "California courts would construe the phrase 'physical loss of or damage to' as *requiring* an insured to allege *physical alteration* of its property." *Id.* at 892 (emphasis added). Any claim by Menchies for coverage stemming from the purported "disruption of [its] normal business operations," Am. Compl. ¶ 6, therefore must fail. *See, e.g.*, *Musso & Frank Grill Co. v. Mitsui Sumitomo Ins. USA Inc.*, 293 Cal. Rptr. 3d 1, 5, 77 Cal. App. 5th 753, 760 (Cal. Ct. App. 2022), *review denied* (Aug. 10, 2022) ("At this point, there is no real dispute. Under California law, a business interruption policy that covers physical loss and damages does not provide coverage for losses incurred by reason of the COVID-19 pandemic."); *Baker v. Oregon Mut. Ins. Co.*, No. 21-CV-15716, 2022 WL 807592, at *1 (9th Cir. Mar. 16, 2022) (affirming district court finding "that neither the COVID virus nor COVID-related closure orders caused direct physical loss or damage within the meaning of the insurance policy" and dismissing complaint); *Rialto Pockets, Inc. v. Beazley Underwriting Ltd.*, No. 21-CV-55196, 2022 WL 1172134, at *2 (9th Cir. Apr. 20, 2022) (concluding that the "district court correctly granted Defendant's motion to dismiss" because "in the absence of any such loss caused by direct physical damage, the inability to use the property that resulted from [government orders]

is not covered by the policy language concerning losses 'directly resulting from direct physical loss . . . to [p]roperty'").[5]

Interpreting "direct physical loss of or damage" as requiring a *physical* alteration of property is consistent with other provisions of the Mass Bay policy. *See Producers Dairy Delivery Co. v. Sentry Ins. Co.*, 718 P.2d 920, 916 n.7, 226 Cal. Rptr. 558, 565 n.7, 41 Cal. 3d 903, 927 n.7 (Cal. 1986) ("[L]anguage in a contract must be construed in the context of that instrument as a whole."). For instance, the Policy provides coverage for "the actual loss of Business Income . . . during [a] period of restoration." MB Policy 252. A "period of restoration" is defined as beginning "after the time of direct physical loss" and ending "when the property [can] be repaired, rebuilt, or replaced" *or* the date on which "business is resumed at a new permanent location." MB Policy 260. As the Ninth Circuit explained in *Mudpie*, "[t]hat this coverage extends only until covered property is repaired, rebuilt, or replaced, or the business moves to a new permanent location suggests [that] the Policy contemplates providing coverage only if there are physical alterations to the property." 15 F.4th at 892; *see generally* Barry R. Ostrager & Thomas R. Newman, *Handbook on Insurance Coverage Disputes* § 21.09[a] (21st ed. 2022) ("*Handbook on Ins. Coverage*").

      b.     *Presence of the COVID-19 Virus on Menchies' Property*

Menchies next contends that the COVID-19 virus *itself* damaged its property. Am. Compl. ¶¶ 62–70. Even assuming that Menchies plausibly alleges that the virus was present on its property, the Court is not persuaded that these allegations demonstrate physical loss or damage.

California courts have largely concluded that the physical presence of the COVID-19 virus on covered property—standing alone—*does not* demonstrate physical loss or damage. In *United*

---

[5] This is the near universally accepted interpretation of the "direct physical loss" requirement. *See, e.g.*, *10012 Holdings, Inc. v. Sentinel Ins. Co.*, 21 F.4th 216, 222 (2d Cir. 2021). *See generally* Barry R. Ostrager & Thomas R. Newman, *Handbook on Insurance Coverage Disputes* § 21.09[a] (21st ed. 2022).

*Talent Agency v. Vigilant Insurance Company*, 293 Cal. Rptr. 3d 65, 77 Cal. App. 5th 821 (Cal. Ct. App. 2022), a California appellate court concluded that "the presence or potential presence of the virus *does not* constitute direct physical damage or loss" because "the presence of the virus *does not* render a property useless or uninhabitable, even though it may affect how people interact with and within a particular space." 293 Cal. Rptr. 3d at 79, 77 Cal. App. 5th at 838 (emphases added). Another California appellate court reached the same conclusion in *Apple Annie, LLC v. Oregon Mutual Insurance Company*, 298 Cal. Rptr. 3d 886, 82 Cal. App. 5th 919 (Cal. Ct. App. 2022), explaining that "[a]lthough the COVID virus has a physical presence, and thus Apple Annie may have suffered economic loss from the physical presence of the COVID virus, it has not suffered 'direct physical loss of or damage to [its] property.'" 298 Cal. Rptr. 3d at 896, 82 Cal. App. 5th at 934–35; *see also Circus Circus LV, LP v. AIG Specialty Ins. Co.*, No. 21-15367, 2022 WL 1125663, at *1 (9th Cir. Apr. 15, 2022) ("Despite Circus Circus's allegation that the COVID-19 virus was present on its premises, it has not identified any direct physical damage to its property caused by the virus which led to the casino's closure."); *Kevin Barry Fine Art Assocs. v. Sentinel Ins. Co.*, 513 F. Supp. 3d 1163, 1171 (N.D. Cal. 2021) ("The virus COVID-19 harms people, not property."); *Pappy's Barber Shops, Inc. v. Farmers Grp., Inc.*, 491 F. Supp. 3d 738, 740 (S.D. Cal. 2020) ("[T]he presence of the virus itself, or of individuals infected [with] the virus, at Plaintiffs' business premises or elsewhere do not constitute direct physical losses of or damage to property."). This reasoning is consistent with the overwhelming majority view throughout the United States. *See, e.g.*, *Kim-Chee LLC v. Phila. Indem. Ins. Co.*, No. 21-CV-1082, 2022 WL 258569, at *2 (2d Cir. Jan. 28, 2022). *See generally Handbook on Ins. Coverage* § 21.09[f].

Menchies does not respond to, or even attempt to distinguish, this authority. Instead, Menchies urges the Court to follow *Marina Pacific Hotel & Suites, LLC v. Fireman's Fund*

9

*Insurance Company*, 296 Cal. Rptr. 3d 777, 81 Cal. App. 5th 96 (Cal. Ct. App. 2022), and its progeny. *See* Pl. MB Opp. 8–11. In *Marina Pacific*, a California appellate court concluded that plaintiffs had pled "direct physical loss or damage to covered property" sufficiently to survive a demurrer[6] by alleging that "COVID-19 . . . not only lives on surfaces but also bonds to surfaces through physicochemical reactions involving cells and surface proteins, which transform the physical condition of the property." 296 Cal. Rptr. 3d at 787, 81 Cal. App. 5th at 108. The *Marina Pacific* court acknowledged that its "conclusion [was] at odds with almost all . . . decisions considering whether business losses from the pandemic are covered by . . . first person commercial property insurance." 296 Cal. Rptr. 3d at 788, 81 Cal. App. 5th at 109. Importantly, the court justified its departure from "almost all" other decisions by explaining that "the pleading rules in *federal court* are significantly different from those [that California courts] apply when evaluating a trial court order sustaining a demurrer." *Id.* (emphasis added). Specifically, *Marina Pacific* explained that "[u]nlike in federal court, the plausibility of the insureds' allegations [have] *no role* in deciding a demurrer under governing state law standards." 296 Cal. Rptr. 3d at 788, 81 Cal. App. 5th at109–110 (emphases added).

The same is not true in this federal court. To survive a motion to dismiss, Menchies' complaint "*must* contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.'" *Iqbal*, 556 U.S. at 678 (emphases added); *see Gasperini v. Ctr. for Humans., Inc.*, 518 U.S. 415, 427 (1996) ("Under the *Erie* doctrine, federal courts sitting in diversity apply . . . *federal* procedural law." (emphasis added)). The *Marina Pacific* line of authority does not therefore save Menchies' claim. *See Sar Holdings, Inc. v. Affiliated FM Ins. Co.*, No. 22-CV-01565, 2023 WL 1096359, at *4 n.4 (N.D. Cal. Jan. 18, 2023) ("*Marina* is unpersuasive because

---

[6] In California, a "demurrer tests the legal sufficiency of the factual allegations in a complaint." *Marina Pac.*, 296 Cal. Rptr. 3d at 784, 81 Cal. App. 5th at 104.

10

it applies California's less-stringent pleading standard"); *Always Smiling Prods., LLC v. Chubb Nat'l Ins. Co.*, No. 21-CV-5990, 2022 WL 4102315, at *3 n.5 (C.D. Cal. Sept. 6, 2022) (declining to apply *Marina Pacific* because *"*the pleading rules in federal court are significantly different"); *Creative Artists Agency, LLC v. Affiliated FM Ins. Co.*, No. 21-CV-08314, 2022 WL 3097371, at *5 n.3 (C.D. Cal. July 27, 2022) (declining to apply *Marina Pacific* because it was "at odds with the majority of decisions within [the] district"); *Showa Hosp., LLC v. Sentinel Ins. Co.*, No. D080008, 2023 WL 3711255, at *8 (Cal. Ct. App. May 30, 2023) ("We do not follow *Marina Pacific*. Instead, we continue to follow the majority approach in California that 'temporary loss of use of a property due to pandemic-related closure orders, without more, does not constitute direct physical loss or damage.'" (citations omitted)). The Court does not find plausible Menchies' contention that the physical presence of COVID-19 on its properties—without more—constitutes physical harm or damage. Accordingly, this claim for coverage fails as a matter of law.[7]

    c.    *Remediation Measures*

Finally, Menchies claims that it undertook "remediation measures"—such as cleaning, disinfecting, or replacing air filtration systems—in response to the virus and/or government shutdown orders, which constitutes direct physical loss or damage. Am. Compl. ¶ 128. Menchies' own *purposeful* alterations did not damage or destroy its property. Quite the opposite—Menchies concedes that its remedial efforts made the property "safe for its intended use." Am. Compl. ¶ 50.

---

[7] Menchies also contends that there is "longstanding precedent finding that non-visible but undeniably dangerous substances can cause 'direct physical loss' to property," such as with "the presence of lead dust, bacteria and asbestos fibers." *See* Pl. MB Opp. 12. Menchies cites only *non*-California case law in support of this proposition. In any event, the *United Talent Agency* court distinguished similar precedent, explaining that "[w]hile the infiltration of asbestos . . . or environmental contaminants . . . constituted property damage in that they rendered a property unfit for a certain use or required specialized remediation, the comparison to a ubiquitous virus transmissible among people and untethered to any property [was] not apt" because, unlike with those contaminants, the COVID-19 virus is not "installed [in] building materials" or "necessarily tied to a location," and did not "require specific remediation or containment to render [it] harmless." 293 Cal. Rptr. 3d at 79, 77 Cal. App. 5th at 838. The Court is therefore not persuaded by this authority.

*See Travelers Cas. Ins. Co. v. Geragos & Geragos*, No. 20-CV-3619, 2021 WL 1659844, at *5 (C.D. Cal. Apr. 27, 2021), *appeal dismissed*, No. 21-55626, 2022 WL 2187413 (9th Cir. Feb. 16, 2022) ("[W]hile these actions indicate physical *changes* to the property, G&G has not explained how its property has been physically *damaged* in any way." (emphasis in original)); *Cafe La Trova LLC v. Aspen Specialty Ins. Co.*, 519 F. Supp. 3d 1167, 1182 (S.D. Fla. 2021) ("Remarkably, under Plaintiff's logic, the 'repair[s]' it undertook while its operations were suspended caused the very 'damage' it now asserts is sufficient to invoke coverage in the first instance . . . . Such a construction is nonsensical."). The Court therefore finds that Menchies' remediation measures do not constitute physical loss or damage under the Policy. *See United Talent*, 293 Cal. Rptr. 3d at 80, 77 Cal. App. 5th at 839 (noting that "[o]ther courts have . . . held that cleaning or employing minor remediation or preventive measures to help limit the spread of the virus *does not* constitute direct property damage or loss" (emphasis added)).

Because Menchies does not plausibly allege that it experienced direct physical loss or damage to property, it is not entitled to coverage under the Mass Bay Policy.

2. *The Virus Exclusion Bars Coverage*

Even assuming that Menchies *did* adequately allege direct physical loss or damage, the Virus Exclusion bars any claim for coverage. Specifically, the Virus Exclusion bars coverage "for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease." MB Policy 278.

Menchies' alleged losses were caused by the COVID-19 virus. Menchies itself affirmatively alleges this point. *See* Am. Compl. ¶ 66 ("COVID-19 and SARS-CoV-2 cause direct physical loss of or damage to property (or both)."); ¶ 68 ("[T]he impact of potentially fatal COVID-19 constitutes direct physical loss of or damage to property (or both)."). To the extent

that Menchies argues that its losses were *actually* caused by government orders (or something else), the Court rejects such a contention. "California courts *broadly* interpret the term 'resulting from' in insurance contracts." *Mudpie*, 15 F.4th at 894. In *Mudpie*, the plaintiff argued that government shutdown orders "most directly caused its injury." *Id.* The Ninth Circuit disagreed, holding that plaintiff did not "plausibly allege that 'the efficient cause,' *i.e.*, the one that set others in motion, was anything other than the spread of the virus throughout California." *Id.*; *see also HP Tower Invs., LLC v. Nationwide Mut. Ins. Co.*, No. 21-CV1369, 2021 WL 4841054, at *3 (C.D. Cal. Oct. 12, 2021), *aff'd*, No. 21-56240, 2023 WL 2363690 (9th Cir. Mar. 6, 2023) (concluding that [a] virus exclusion applied and precluded all coverage despite plaintiffs' contentions that "their 'losses were not caused by a virus' but rather by 'the pandemic and associated fear'"). Because Menchies' losses resulted from the COVID-19 virus, the virus exclusion applies and bars Menchies' claim for coverage.[8]

Menchies entirely ignores this authority. Instead, Menchies confusingly asserts that the Virus Exclusion "is not paramount but co-equal to [the] Food Contamination additional coverage extension" and, citing to Missouri and Minnesota law, contends that where "one endorsement clearly grants and another endorsement bars coverage for the same thing," neither provision "may take priority over the other." Pl. MB Opp. 16–17. That assertion makes little sense because the Virus Exclusion and Food Contamination Provision are not in conflict here. While the Virus Exclusion is clearly applicable due to the presence of a *virus*, the Food Contamination Provision applies only where Menchies' food its tainted by a "*bacterial* microorganism." MB Policy 174 (emphasis added). Given the Court's duty to interpret the Policy so as "to give effect to every part,

---

[8] The Court notes that the policy at issue in *Marina Pacific* did not contain a virus exclusion. *See Marina Pacific*, 296 Cal. Rptr. 3d at 791, 81 Cal. App. 5th at 113. The same is true of the policy in *Butter Nails v. Underwriters At Lloyd's, London*, No. B311455, 2022 WL 3653866 (Cal. Ct. App. Aug. 25, 2022), which is cited extensively in Menchies' opposition brief. *See* Pl. MB Opp. 7–10.

if reasonably practicable," the Court declines Menchies' invitation to disregard the Virus Exclusion. *People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.*, 132 Cal. Rptr. 2d 151, 158, 107 Cal. App. 4th 516, 525 (Cal. Ct. App. 2003).

### 3. *Menchies Does Not Allege Food Contamination*

Menchies contends that the Food Contamination Provision of the Mass Bay Policy provides coverage because Menchies incurred losses "from government closures" and those closures were "directly related . . . to potential food contamination." Pl. MB Opp. 18. Specifically, the Amended Complaint alleges that "COVID-positive Menchies employees . . . handled [the frozen yogurt] toppings," that Menchies' "property and food products" were thereby contaminated, and that Menchies was "forced to destroy significant amounts of products at all Menchies retail locations" as a result. Am. Compl. ¶¶ 94, 95, 98. This claim fails.

The Food Contamination Provision provides limited coverage *only* where Menchies "is ordered closed by the Board of Health or any other governmental authority as a result of the discovery of 'food contamination.'" MB Policy 140. "Food contamination" is defined as "an incidence of food poisoning" resulting from, among other things, a "communicable disease" that is "transmitted through one or more of [Menchies'] employees." MB Policy 174. A "communicable disease" is "a *bacterial* microorganism transmitted through human contact with food." MB Policy 171 (emphasis added).

Menchies clearly does not state a claim for coverage under this provision. As discussed above, COVID-19 involves a *virus*, not bacteria. Menchies does not contest this fact. Menchies therefore cannot allege that COVID-19 constituted a "communicable disease" under the Mass Bay Policy. Nor does Menchies allege that "food contamination" was ever discovered by any governmental authority in any of its food products on any of its business properties. Similarly,

Menchies does not plead that any of its stores were "ordered closed . . . *as a result of* the discovery of 'food contamination.'" As Menchies well knows, the closure orders implemented during the COVID-19 pandemic were not unique to its business and did not result from the discovery of contaminated food. *See* Am. Compl. ¶ 85. For these reasons, Mass Bay's motion to dismiss is granted.

## II.     HCC's Motion to Dismiss is Granted in Part and Denied in Part

Defendant HCC's Restaurant Recovery Policy does *not* address losses resulting from property damage or lost business income. Instead, HCC's Policy insures Menchies against losses "caused by or resulting from . . . Accidental [Food] Contamination." The Mass Bay and HCC Policies provide separate and distinct coverage and appear designed to complement one another.

The HCC Policy defines "Accidental Contamination" as "any actual accidental or unintentional contamination, impairment or mislabeling of an Insured Product(s),[9] which occurs during or as a result of its production, preparation, manufacture, packaging or distribution – provided that the use or consumption of such Insured Product(s) has resulted in or would result in clear, identifiable, internal or external visible physical symptoms of bodily injury, sickness, disease or death of any person(s), within three hundred and sixty five (365) days following such consumption or use." HCC Policy 9.[10]

---

[9] Insured Products are defined as "all ingestible products for human consumption, or any of their ingredients or components . . . that have been reported to the Insurer . . . and that are in production; or have been manufactured, handled or distributed by the Insured; or manufactured by any contract manufacturer for the Insured." HCC Policy 13.

[10] The HCC Policy is significantly broader than Mass Bay's Food Contamination coverage. Unlike the Mass Bay Policy, the HCC Policy does not require that the contamination be "bacterial," that Menchies' properties be shut down by a government agency, or that any business closures result from "the discovery of 'food contamination.'" Quite the opposite, the HCC Policy broadly provides coverage for "*any* actual accidental or unintentional contamination, impairment or mislabeling" of Menchies' food products. HCC Policy 9. The contamination can also occur at virtually any time, including when the products are "distribut[ed]." HCC Policy 9. Moreover, the "the use or consumption" of Menchies' food products need not *actually* result in any actual bodily injury or sickness—so long as Menchies' can demonstrate that the contamination "*would result* in clear, identifiable . . . physical symptoms" within one year of use or consumption. HCC Policy 9.

Menchies contends that its food was accidentally contaminated under the HCC Policy because "COVID-positive Menchies employees" at its stores "handled [the frozen yogurt] toppings." Am. Compl. ¶¶ 94, 95. Menchies also alleges that its properties were visited by "thousands of individuals a day . . . carrying [the COVID-19 virus]" who "breath[ed]" the virus into the air, "touched countless surfaces," and, importantly, "handle[d] [its] toppings." Am. Compl. ¶¶ 88, 94. HCC argues that Menchies has "failed to allege a covered loss." HCC Mem. 1. HCC also asks the Court to dismiss Menchies' claim for declaratory relief because it is not an independent cause of action. HCC Mem. 8–10.

HCC contends that New York law applies to the interpretation of its Policy. *See* HCC Mem. 5. Menchies does not dispute that contention, *see generally* Pl. HCC Opp., "and such implied consent is sufficient to establish choice of law." *Krumme*, 238 F.3d at 138.

1. *Menchies Alleges a Covered Loss Under the HCC Policy*

Menchies states a claim for coverage under the HCC Policy. Menchies alleges that its food products (specifically, the yogurt toppings) were contaminated by the virus because COVID-19 positive employees and customers "handled the toppings." Am. Compl. ¶¶ 94, 95. Moreover, Menchies alleges that the COVID-19 virus *can* result in—and indeed, *has* resulted in—sickness or death for many millions of Americans. Am. Compl. ¶ 4. Drawing all reasonable inferences in Menchies' favor, these allegations are sufficient to state a claim for coverage.

HCC does not persuade otherwise. HCC first avers that the Amended Complaint does not allege "a *specific* instance or location where COVID *actually* contaminated Menchies [sic] yogurt or toppings." HCC Mem. 6 (emphases added). HCC is incorrect. Menchies alleges that its products were contaminated at "numerous locations" because COVID-19 positive employees and customers "handled the toppings." Am. Compl. ¶¶ 94, 95. In any event, such specificity is not

required. To proceed beyond a motion to dismiss, Menchies need only state a "plausible entitlement to relief." *Twombly*, 550 U.S. at 559. HCC also asserts—without legal authority or reference to the Policy language—that Menchies must allege "that *eating* yogurt . . . with toppings potentially exposed to airborne COVID virus . . . can cause illness or death." HCC Reply 3 (emphasis in original). Not so. The Policy provides coverage where the "consumption *or use*" of contaminated food products would result in illness. *See* HCC Policy 9 (emphasis added). Although the Court is somewhat skeptical of Menchies' contention that "patrons consuming contaminated products would have become ill from COVID-19 in the absence of Menchies' actions" to destroy its food products, *see* Pl. HCC Opp. 8–9, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (quotation marks and citation omitted). The Court has considered HCC's other unsupported assertions and finds them to be without merit. Accordingly, HCC's motion to dismiss the breach of contract claim asserted against it is denied.

      2.     <u>*The Declaratory Judgment Claim is Dismissed*</u>

HCC also moves to dismiss the declaratory judgment claim, contending that declaratory relief is not an independent cause of action. *See* HCC Mem. 8–10. HCC is correct. A "request for relief in the form of a declaratory judgment does not by itself establish a case or controversy involving an adjudication of rights." *In re Joint E. & S. Dist. Asbestos Litig.*, 14 F.3d 726, 731 (2d Cir. 1993); *see also Cisco Sys., Inc. v. Synamedia Ltd.*, 557 F. Supp. 3d 464, 474 (S.D.N.Y. 2021) ("A request for relief in the form of a declaratory judgment does not constitute an independent cause of action."). The separate "claim" for declaratory relief is dismissed. However, Menchies may, of course, still seek declaratory relief on its claim.

**CONCLUSION**

For the foregoing reasons, the motion to dismiss filed by Mass Bay is GRANTED. The motion to dismiss filed by HCC is GRANTED IN PART and DENIED IN PART. The motion for oral argument is DENIED. The Clerk of Court is respectfully requested to terminate docket entries 21, 25, and 31.

**SO ORDERED.**

Date:  **August 31, 2023**  
       **New York, NY**

*Mary Kay Vyskocil*  
**MARY KAY VYSKOCIL**  
**United States District Judge**